We'll hear argument next in Cooper v. Ruane, Cuniff, and Goldfarb, 17-2805. Good morning, Your Honors. May it please the Court, Monique Olivier for Plaintiff and Appellant Clive Cooper on behalf of the DST Plan. Ruane seeks to compel arbitration under an agreement to which it is not a party and which it did not even know about until the onset of this issue in this case. Those claims allege that Ruane, as the sole investment advisor for DST, breached its fiduciary duty to the DST Plan and caused losses to that plan in excess of $100 million. Plaintiff's claims are brought under 502A2 of ERISA to enforce the provisions of 409A to, as the specific language of that statute provides, hold Ruane liable to make good to such plan for losses to the plan and to restore to such plan any such profits. Why shouldn't we view that claim as a claim brought by your client as a beneficiary rather than on behalf of the plan? Your Honor, under 502A2, Mr. Cooper is bringing the claim as a plan participant and that claim is a claim that is on behalf of the plan as opposed to an individual claim. And if you look at the Supreme Court cases that interpret 502A2, they are all in line with that reasoning. Are you referring to Russell? Russell, Verity v. Howe, LaRue, all of those cases contemplate that... So the Ninth Circuit seems to have a slightly different view of these claims under Section 502, is that right? I don't believe so, Your Honor. I assume you're referencing the Monroe case. And I think that basically the court in Monroe reaches a decision that is consistent with Supreme Court authority. That is, 502A2 provides for plan-wide relief. And LaRue has... LaRue's facts, I think, are very critical because they get distorted in both Ruane's briefing and the briefing in the Monroe case. If you look at the facts of LaRue, that involved an individual participant who was complaining about losses to his individual account based on a failure to invest in specific investments. In that case, the plan losses were the losses to his individual account. So if you look at LaRue in context, particularly if you look at the concurring opinions, it becomes very clear that the Supreme Court is saying 502A2 is plan-wide relief. You can get plan relief and you have a right as a participant or a beneficiary, just the same as you would if you were the Department of Labor or a fiduciary, to seek relief under 502A2. That statute makes no distinction between the rights of a beneficiary or a participant on the one hand and the rights of the Department of Labor or a fiduciary. So in this instance, Mr. Cooper is standing in the shoes, essentially, of the Department of Labor and seeking to enforce plan-wide relief. And that's even more so in this case because, in fact, as the record reflects, we have a joint prosecution agreement with the Department of Labor and we're actively working with them in this case to pursue plan-wide relief. There hasn't been any ruin. He's standing in the shoes of the plan, right? He's suing on behalf of the plan against the plan's fiduciary. Correct. Correct, Your Honor. So does he have to make a demand on the plan? Well, I mean, at the outset, there was a 104 demand that was made.  Correct. Correct. But the only way he can actually do this, the only way he's got standing to do this is because he is an employee, or I guess if he were related to an employee and covered by the plan, he might also have standing. Is that right? He has standing because he is a participant in the plan. But if he's a participant in the plan and that arises out of his being an employee of DST, then why isn't that covered by the DST employment agreement? Because the DST employment agreement articulates that it is intended to cover employment-related disputes arising out of or relating to Mr. Cooper's employment. It doesn't say employment-related disputes. It does, Your Honor. What are you referring to? If you look at the arbitration clause itself, which I believe starts at the record in the joint appendix around page 159, states that the arbitration clause is limited to individual employment claims between the employee and DST. Well, this arbitration program and agreement covers all legal claims arising out of or relating to employment, right? Yes, Your Honor. I'm sorry. My reading of the statute of that language is the same, which is . . . Well, but arising out of or relating to employment is generally considered to be very broad language for purposes of an arbitration provision, right? It is broad, but it is not boundless. And, in fact, when you look . . . and I think that that is where the Monroe case gets it right in the sense that you are talking about individual employment claims versus . . . And the arbitration clause is very clear. It has to be claims brought by a single associate and it cannot in any way reflect collective claims, class-wide claims, claims of other . . . employees who would be planned participants. And, in that way, it restricts and does not contemplate Mr. Cooper's rights to bring a 502A2 claim, which is a claim for plan-wide relief. Is it your position that Monroe . . . that a decision in Monroe that the Supreme Court might issue would govern this case? No, Your Honor, because there are a number of reasons. This Court certainly could follow the reasoning in Monroe and we submit that that would be a correct outcome. But, in this case . . . Do you think the language is similar enough in the two arbitration agreements? I do, Your Honor. In fact, in this case, the language is narrower than in the Monroe case. The Monroe arbitration agreement talks about all claims between the parties of any type. This arbitration agreement focuses on arising out of or relating to employment. But, there's a separate argument that we make at the outset, which is that, frankly, Ruane is looking at the wrong agreement. And, the district court . . . The first argument is the IMA agreement. Correct, because if you look at the . . . Although, in answer to Judge Sullivan's question, you went right to the arbitration addendum, because you conceded that he was . . . he had standing purely by virtue of the fact that he was a participant in the plan. I don't agree that that is the connection. I do agree that Mr. Cooper is a participant in the plan and that he is a participant in the plan by virtue of his employment. But, when he's suing under 502A2, he is suing on behalf of the plan. It's a representative claim. And, the arbitration clause talks about individual employment claims. That's just not what this case is. And, particularly if you're talking about Ruane, let's remember that Ruane is not a signatory to the arbitration addendum. So, the only way we get to Ruane is if this court finds that the 502A2 claim is within the scope of the arbitration agreement. And, that Cooper is equitably estopped from resisting arbitration by Ruane as a non-signatory. We would avoid all of these issues if we rested it on . . . if we agreed with you and rested it on equitable estoppel. So, why don't you take us through that? Sure. So, the equitable estoppel claim, as this court is aware, the doctrine of equitable estoppel, the idea is that you cannot both take advantage of a contract and resist its terms at the same time. So, if you look at the arbitration agreement, Mr. Cooper is not trying to take advantage of the language of that agreement in any way when he's bringing the 502A2 claims. Obviously, he's not invoking the agreement. And, I think the district court basically just applied the concept of equitable estoppel too broadly because it sort of assumed that there was some connection and that was enough. And, that it really didn't look at that question of, is Mr. Cooper trying to take advantage of or rely upon the contract in any way? But, even assuming you then get to that point of, okay, let's apply equitable estoppel, there are two steps that the court needed to go through. It first needed to find that there's an intertwinedness between Mr. Cooper's claims under ERISA and the arbitration clause. And then, you also have to find a close relationship. And, I would submit that Ruane doesn't satisfy either of those tests, particularly if you look at the close relationship cases. Didn't you initially bring suit against the company and the plan? Yes, Your Honor. Doesn't that suggest there's a pretty close relationship? No, because you're looking at the close relationship between Cooper and Ruane. Ruane continues to make this argument that you can look at the relationship between DST and Ruane. But, I submit that if you look at the equitable estoppel cases in context, that's not, in fact, what they say. You look at, because, again, you're looking at, can Cooper be estopped from resisting arbitration? And so, if by a third party, is there some contemplation that Cooper expected or consented to arbitrate with a third party who's clearly not a signatory, not a parent, not a subsidiary, not an agent of DST, does not have that kind of close relationship, very different from the situation in the Ragone case, where you're talking about a joint employment context. So he wasn't an agent of DST, but it was working closely with the advisory committee, right, and was acting as an agent to manage the plan at their direction. Was acting as their investment manager, correct, and was acting as a fiduciary for the DST plan, but not an agent with respect to Cooper's employment. No connection with respect specifically to Cooper's employment. Only connection to Cooper was to the extent that Cooper was participating in the plan. And again, remember, this is a claim for plan-wide relief. So Cooper is, you know, a tiny little part of the 10,000 people who are participants in this plan. As I recall it, did determine that there was a sufficiently close relationship based on Mr. Cooper's knowledge that Ruane was the investment advisor. I would submit that that is a mischaracterization of what the record actually says. Mr. Cooper testifies that- When you say that, the way that I describe it- No, I'm sorry, Your Honor. My apologies, Your Honor. Not the way that you described it, but what the district court found. You're right that the district court does suggest that there is a close relationship. But if you look at the record, Mr. Cooper testified. He didn't really-yes, he received these statements. He received the SPDs, the summary plan documents that identified Ruane. But note that the SPDs actually stated that for fiduciary breach claims under ERISA, you had a right to bring those claims in federal court. Nothing about arbitration in the SPDs. Those are documents that-those are the documents that Mr. Cooper received that identified Ruane. And he testifies that he really didn't know about Ruane until he saw these losses. So yes, there is evidence in the record that he received these documents. But not evidence in the record that he actually understood Ruane's connection until the losses started to occur. Just one quick question. DST was originally named as a defendant. Correct, Your Honor. Eventually dismissed. Is it your view that the arbitration agreement prevents Cooper from suing DST? No, Your Honor. No. So why dismiss? We dismissed with a tolling agreement. It was a dismissal without prejudice. And it was done, and this is all in the record again, because the-for two reasons. One, there was a strategic decision made to focus the efforts of the case on Ruane. It was the primary wrongdoer here. It was Ruane's investments that led-investment mismanagement that led to the losses. And secondarily, that there was an agreement within the tolling agreement that the parties were willing to go to mediation to try and resolve the dispute with DST. And your view is that that's entirely irrelevant in any event? Absolutely, Your Honor. And am I-oh, go ahead. Go ahead. Am I right that there's separate proceedings pending related to this very investment problem, both by non-employees or former employees, potentially, or employees who did not sign the arbitration agreement or opted out? Is that right? That's correct. That's the Ferguson action. They did not opt out. Ruane does make that statement in its papers, but that's incorrect. The participants in the Ferguson plan were never bound by the arbitration. They were retired before the arbitration. Oh, okay. That's correct, Your Honor. And so that case is pending presently. Thank you. You're reserved three minutes for rebuttal. We'll hear from Mr. Ward. Thank you. Good morning. Robert Ward. I'm Schulte, Roth, and Zabel on behalf of Ruane Kniff. I may do this a little backwards. I will get into equitable estoppel, but let me just start with what I'll call the Monroe case, although I don't really think it's the Monroe case as decided by the Ninth Circuit. I think it's the Monroe case as described by the appellant here. But first off, I don't think we ought to get into the Monroe. To me, it's up to the court. I think that the Monroe issues, if you will, were waived. In the lower court, the argument made by the appellant was that the IMA, the Investment Management Agreement, was the agreement that established the fiduciary duty of RCG and that the IMA did not have an arbitration clause and, therefore, there couldn't be arbitration. It was a very focused argument, and it was very focused on the IMA. Only now, before this court, is the appellant saying, well, that's not what we were arguing. What we were arguing is that no participant can agree to arbitrate a claim because the claim belongs to the plan. That's not the argument that was made before the lower court. The argument made before the lower court related not to the plan and its rights, but related to a textual analysis of the IMA. So I think that the issue was waived under a well-established authority before this court, and I think it might have been Judge Sullivan. I'm not sure. Actually, Judge Carney, you mentioned that the Supreme Court may, and it's on February 15th is supposedly going to decide the issue of the writ of cert on the Monroe case. What I'm trying to say is I don't think there's any reason this court should be looking at the Monroe issues, and there's two more reasons I would say at first, and I think, Judge Sullivan, this might have been you, said that what happened almost immediately after this case began, because it was Mr. Cooper suing Ruane and 11 related DST defendants. Now, as we put in the record, DST is a company with $2.8 billion in revenue. Most plaintiffs' counsel, and I'm not maligning them, but are not going to let go of a $2.8 million defendant unless they have to. What happened is counsel for DST, shortly after the case was brought, contacted the plaintiff and said, you know there's an arbitration agreement. Within a month or so of that, the claims against DST were dropped. Now, if Mr. Cooper- Do we have anything on the record about the back and forth between that initial contact and the dropping of the lawsuit? There was a substantial amount that was on the record before the lower court, because we did discovery. Judge Pauley allowed us to do discovery to look into those issues. For the life of me, and I apologize standing here today, I don't know what exactly is in the record or is in the appendix before this court. But certainly, all of those issues, including the emails back and forth between the appellants and DST and their counsel, are clearly in the record before the lower court. But the point is, what happened is, if the appellant really believed the position it's taking right now, which is that the plan owns the claims and that no participant can sign an arbitration agreement, they would not have dismissed against DST. DST was the bigger fish by far. And I hear appellants' counsel say, well, we dismissed them, and I read in their papers, to go after the primary defendant, not the secondary. I mean, if you read the complaint, and I would apologize because I can't focus on one or two paragraphs, but if you read the whole complaint, it reads jointly against both DST and against RCG. In fact, when I took the deposition of Mr. Cooper, he said they were jointly responsible, they jointly took care of my plan. This relates largely, if I understand what you're saying correctly, to the equitable estoppel. It does, but what I'm also saying, Your Honor, is the argument was waived, because if the argument was not waived at the lower court, they would have not dismissed DST. They would have said to DST, you're in because no one could sign this arbitration agreement. They didn't do that, and they didn't do that when they were arguing the IMA argument, which was purely textual related to the IMA and the fact that it didn't have any arbitration agreement. They're only raising this issue now because of Monroe. And the other point that I would make about Monroe, in addition to the fact that it may well be decided by the Supreme Court, is there is the Ferguson case, which, Judge Carney, you referred to, in addition to the arbitrations. The Ferguson case is brought by three, I may have called them opt-outs by accident, and I apologize, the retirees. But they're seeking to represent the whole 10,000 members of the plan, just like Mr. Cooper, who was- Are the retirees subject to this arbitration addendum? Yes, Your Honor, because I think- before the arbitration addendum was executed. Your Honor, I would- hearing Your Honor so articulately put that issue, I would have to say I'm not sure, but I don't think it's- Isn't that an important question for you to know the answer to? It's actually not an important question, Your Honor, because there are so few retirees. It's a 10,000-member plan, most of whom were employees. What is their standing? What is their standing? Well, there's two ways that they've tried to do it. One, Mr. Cooper came up. He had signed the arbitration agreement, but he said, I'm bringing this claim on behalf of all the members. It was a class action. Now, Mr. Cooper was acting as a class plaintiff, and we pointed out that he couldn't do that by virtue of the arbitration agreement. But the three Ferguson plaintiffs are also trying to act on behalf of all 10,000 members. So I'm still back on my same first argument, which is why this Court shouldn't deal with the Monroe issues, and I'm sorry that I'm throwing it out. But the fact is that the Ferguson case has the same issue inherent in it that Appellant is trying to raise, and we're calling it the Monroe issue, which is that in Ferguson, we will, when we get to the right time, make a motion to dismiss with respect to the 95 percent of the plan assets who signed the arbitration agreements. So the District Court at that point will decide whether or not the arbitration agreement governs. But there is a set of people. There are just some number of plaintiffs who are retirees, presumably, who did not sign the arbitration addendum or any agreement containing an arbitration clause who are suing on behalf of the plan. Yes, Your Honor. And they are not subject to arbitration. Do you agree with that? The three of them are not. However, 95 percent of the rest of the plan signed the arbitration agreement. So the issue before the Southern District in the Ferguson case, which was raised by Appellant in its papers, is whether or not the arbitration agreement governs with respect to those 95. It has a class waiver in it. Excuse me, just to interrupt for a second, but you're not taking the position, or are you, that as to those who did not sign the addendum, that they also should be required to arbitrate because 95 percent. No. So they can proceed. They can proceed. They can proceed. And, in fact, there is another action before the Southern District, not brought by the same counsel, where there is a class action for either the retirees or for the opt-outs. But my point, and I'm doing it so slowly and I do apologize for that, is this same issue, the Monroe issue, is going to come back to this court, if it hasn't been decided by the Supreme Court, out of the Ferguson case. And instead of, Your Honors, dealing with the issue here, when it's coming up really for the first time, with any factual or legal analysis before the Southern District, on a scattershot approach, we should wait for Ferguson or clearly wait for the Supreme Court. So the Monroe language is very different from the language here, as I read it. I think it is. Because it covers all claims between Party A and Party B, period. I think it is, Your Honor. I apologize. So, second, though, what is the additional case that you've just referred to? There's Ferguson, but then you say— Oh, there are two other cases in the Southern District right now, Your Honor. And what are those? They're brought by individuals who are opt-outs. Do you have names? Canfield and Menden. I'm sorry, Canfield? Canfield and Menden. And they're also before Judge Carter. So the issue is going to come up to this court at some other point. And I think in a much cleaner way, typically the way it will come up. And that's why there are waiver rules. And I'm not getting into equitable estoppel, but let me very quickly get into equitable estoppel. What we need for equitable estoppel, clearly, is an arbitration agreement. And Cooper's claims are subject to the arbitration agreement. It's a broad arbitration agreement. Do you agree with your adversary, your friend, that the relevant relationship is that between Mr. Cooper and Ruane? No, Your Honor. I believe that the case law is broad enough to show that it's the relationship with the signatories, one or both of them. And here we point out that we have a close relationship to both signatories. What's the best case for that proposition? Your Honor, I think my colleague, Mr. Orlando, will probably get it to me. May I move on slightly and then when he points me to the right case? There are a lot of cases on this issue, Your Honor, on the issue of equitable estoppel. And there are two major issues. Obviously, the entwinedness between the claim and the underlying agreement. Excuse me. Just to clarify, we don't get to the issue of equitable estoppel unless we agree with you, right, that this matter arises from or is related to Mr. Cooper's employment, correct? I think that's right, Your Honor. And I can go through the facts very quickly. Remember, he would not have been in the DST plan. I agree, yeah. But, I mean, there's a but for relationship. He wouldn't have been in the plan. But in terms of what facts he would need to show in order to establish his claim, it seems to me that none have to do with his employment. They have to do with investment decisions. And in terms of arising out of his employment, the fact that retirees and people who are not employees could make the same claim on behalf of the plan suggests to me that its relationship might be a but for relationship, and it does have to do somewhat with compensation, is somewhat more remote than, I think it's not an open and shut case, let me say that. I hear what you're saying, Your Honor, but I think one thing to point out is that no one would ever have been in this DST PSA without having worked for DST. Some of them became retirees at some point. Most of them were employees.  That's part of the question. Is it a but for relationship that it's enough to show relatedness, or is it not? Is there something more? Because, of course, we have all the cases, the False Claims Act case and so on, that also have a but for relationship in which the court said, you know what, this isn't really directly related enough. But in the but for case, in the Welch case, as Your Honor is aware, the fact is the issue that Welch was bringing had nothing to do with his or her employment. I've forgotten whether it was a man or a woman. Much further afield than here. But just to clarify, though, you do agree, then, that we have to decide that it is related enough to be covered by the arbitration clause, by this part of the arbitration clause, in order to get to equitable estoppel. I agree, Your Honor. It has to be covered by the arbitration agreement, and then we have to meet the test for equitable estoppel, and there are two of them, intertwinedness of the dispute with the agreement. But I would like to, I know I'm a little over, but I'd like to get to that and do it very quickly, which is there really are two types of arbitration agreements, and I think there's some confusion brought about by the appellant's brief. There are intrinsic arbitration agreements where you have an agreement. For example, a contract between X and Y, which says that everything arising out of this contract will be arbitrated. Then there are extrinsic arbitration agreements, much like this one, and the same as in Ragone, as in Baroda, and Lismore, and their employment-related claims, where they say everything arising out of the employment relationship. Now, those are different from the Denny case, for example, where there was an intrinsic arbitration agreement. When there's an extrinsic arbitration agreement that's broader, that says everything arising out of the employment relationship, the fact is what the courts look at is whether or not, when the plaintiff pled its claims, they were indistinguishable in terms of the complaint. Judge Carney? I'm not entirely sure I understand what you mean by an intrinsic agreement. I apologize. Maybe that's a word of my own making. There are some of the earlier cases on equitable estoppel involved contracts. Implicit? No, not implicit. Actually express. Let me do it this way. In some of the earlier equitable estoppel cases, there was a contract, let's say a shipping contract, between X and Y company, and within that contract, which was a substantive contract on its own, there was an arbitration agreement that said, or clause, that said everything arising out of this contract is arbitrable. Those are most of the cases that the appellant is relying upon and saying that it's a very narrow set of circumstances. Then there's a second set of cases relating to a different type of arbitration agreement, and Judge Pauly below recognized it, and he called them stand-alone, I called them extrinsic. Much like the one here, where it says, any claim arising out of the employment relationship. And the Ragone case, this Court's Ragone case, the Barotta case, the Lismore case, all have similar stand-alone agreements. And what Judge Pauly pointed out, which is true, is if you strictly applied an argument that the subject matter of the dispute has to arise out of the individual contract itself, then when there's a stand-alone agreement, you would never have equitable estoppel, and that's just not the law, because Ragone clearly, you know, you had a relationship which was not set forth in an agreement, but referred to as stand-alone agreement arising out of the employment relationship. So what I'm saying is there's a slightly different test when there is a stand-alone arbitration agreement. And in that slightly different test, what you do is look and see what the plaintiff did when it pled its complaint, and in the Elganan case and in other cases, what the courts look at is to see if the allegations against the signatory and non-signatory defendants are indistinguishable, and that's exactly the fact here. If you read this complaint, you can't tell one from the other. So I think we meet the first test of intertwinedness. On the second test, which is the relationship... Do you have a case? Do I have? Yes, do I have a case? Oh, do you have a case? I hope so. Thank you, Your Honor. Smith-Enron, Your Honor, which is a Second Circuit case. And Chase Mortgage, which is a Southern District case. I don't know that we have the sites, Your Honor, but Smith-Enron is a venerable case in this area. And the language in these cases is the relationship between, you know, the non-signatory and a signatory. Mr. Hawley, you would agree, focused, I think, on the relationship between Mr. Cooper and Ruane. I think... Not between Mr. Cooper and his employer. Well, we weren't focusing on Mr. Cooper and his employer, Your Honor. What we were focusing on was the relationship between us and DST. I'm sorry, between DST and Ruane, rather. Right. I mean, the relationship between us and DST goes back 40 years. We're their agent and... My question is, in focus, are you saying or are you suggesting that in focusing on the relationship between Mr. Cooper and Ruane, just Paulie got it wrong? That is, he should have focused really on the relationship between DST and Ruane. I think we need to focus on both, and the reason I say this, Your Honor, is there is a number of agency cases. In Ross, the court points out that you look at whether or not the non-signatory was an agent of the signatory, not the plaintiff, but the signatory defendant. In Fensterstock, you look and see if there was an agency relationship between the non-signatory and the signatory defendants. Agency comes up again and again and again. If the relevant relationship is between Mr. Cooper and Ruane, then what on the record would tell me that it's a sufficiently close relationship? I think Judge Paulie went through that, and I think he did it very well. I can do it fairly quickly, Your Honor, which is, and we take great pains to point out that Mr. Cooper was a very bright man, math and physics undergraduate. But he is, I mean, forget the standing issue for a second. Right. He is suing on behalf of the plan, so tell me why a plan participant would have a close relationship with its employer's investment advisor. Because he did, Your Honor, because from the day he started, he saw from the SPD that we were managing his money upwards of $200,000. Secondly, on a regular basis, he got by e-mail, by hard copy, on the Web, and he followed it. He said in his deposition of every plan participant. I don't think it is, Your Honor, but in terms of the class rep. We should look just at him. Well, we should, and, Your Honor, there's something that's very important that I should say, and I'll do this very quickly because I'm running well over. In the LaRue case, the Supreme Court made a very important argument, a very important distinction between a defined benefit plan and a defined contribution plan. This is a defined contribution plan. When it comes to a defined contribution plan, the money may go back into the plan, but it immediately goes into an individual's account. A defined benefit plan, as we all know, which was the prevalent type of plan years ago, there's one corpus. It's not broken up. So a number of the cases that are cited by appellant, which focus on behalf of the plan language, relate. Like Russell, for example, which one of the members of the panel mentioned, that was a defined benefit plan. There's one corpus. If there's a damage to the corpus, there's a damage to all. This is a defined contribution plan. Russell did not make that distinction, I think, in Russell. No, not in Russell. They made it in LaRue, Your Honor, where they pointed out that individualized harm is enough to allow a participant standing. And I think what's kind of confusing things is the mix that the appellants have done of the cases, the defined benefit and the defined contribution plan. This is a defined contribution plan. Mr. Cooper, and the reason we focused on Mr. Cooper, not only was he the putative class rep, but the fact is, if he was damaged, he was damaged in his own plan. There could have been, of these 10,000, there could have been many people who, I think it's in the record, valiant was bought at 19 and eventually went up to 261 and was sold at a lower number, but there was still a 60% profit. Depending on when these individual members of the plan got in and out, they either made a fortune, made a lot of money, or could have lost. Yes, but that's very different from the defined benefit plans, where it's the plan that's the corpus. So it's the plan that's going to lose, and everybody within the plan is either going to win or lose, depending on what happens to the plan. So the defined benefit plan cases are very, very different, and that's where the on-behalf-of-the-plan language is much more important. It's much less important, and that, I think, is the takeaway from LaRue. I wasn't talking about MassMutual, and I apologize if I confused the Court. The takeaway from LaRue is that it can be a case of individualized harm because individual members of a defined contribution plan can be hurt individually in their plan, whereas others may not be. And I have run over a whole lot, Your Honor, so thank you very much. Ms. Olivia. Thank you, Your Honor. Turning back just very briefly to the arising out of or relating to, I would submit you do need more than but-for causation. The cases make that plain. The claims here are claims that involve investment decisions on behalf of the plan. They do not involve Mr. Cooper's personal employment work conditions, and in that way the claims at issue do not arise out of or are related to his claims, and that is the first question we would submit that this Court needs to answer before getting to the equitable estoppel piece. I thought the first question was the IAA question. It is, but it's— This is really the second question. Sorry. Yes, Your Honor. I view those questions as coming under scope. I understand you're right that in terms of the analysis, the first question you would look at is, I mean, it is part of the scope analysis in the sense that it is this dispute within the scope of the arbitration agreement. It's not, first of all, because there's a separate contract that identifies Ruane's fiduciary status, and in fact— I think you're—forgive me, and I don't mean to recharacterize your argument, but I thought your first argument was forget about the arbitration addendum. We've got an IMA. He is suing on behalf of the plan. Separate out the issues of standing. The plan is not subject to arbitration if it sues Ruane, its investment advisor. Is that the argument? That is the argument, Your Honor. That is the argument. So addressing briefly the Ferguson matter and Ruane's characterization of it, first of all, with respect to the dismissal of DST in this matter, it's sheer speculation what the reasons for that dismissal were. There's certainly nothing in the record to suggest that we believed that we were bound to arbitrate the claims with DST, and that certainly has nothing to do with this waiver argument that Ruane is raising. We did not waive essentially the Monroe argument because, again, that's a scope argument. We made the argument below that this dispute is not within the scope of the arbitration clause that Ruane is claiming it is, and that is first because the IMA is actually the controlling agreement, and second because even if you did look at that agreement, it does not arise out of or is related to Cooper's employment. And that's clearly argued in our brief below when we reference the IMA as the controlling agreement. If we were to resolve this dispute based on, for lack of a better term, this Monroe issue, the scope of the arbitration agreement, why wouldn't we wait for the Supreme Court to at least deny cert, or if it grants cert, then a decision? I think because this case is different. I agree that the most straightforward way to resolve this case is just by looking at the IMA and determining that there is not an arbitration clause that would control the dispute. If the court were to look at Monroe and consider the arising out of or relating to, it still would be different because our clause is different. It's narrower than the clause in Monroe, and so it would be a different analysis, and there would be distinguishable reasons to resolve the case on the scope basis. The last point I wanted to make is with respect to the LaRue and this defined contribution versus defined benefit plan, if you look at our complaint, and the site is the joint appendix at page 21, paragraph 29 of our complaint, actually describes the PSA at issue here, which really functioned as a defined benefit plan. It's paragraph 29 of the complaint, and that's because the way the PSA operated was that Ruane controlled the investments. This wasn't a classic 401K where individuals have individual accounts and they're controlling what happens in those accounts. The PSA was totally separate. It was governed simply by DST's contributions that Ruane managed and invested, and in that way the losses that were incurred and the focus of the fiduciary breach claims operate essentially as a defined benefit analysis in the way that LaRue talked about because they are plan-wide losses. You can break them down into losses in individual accounts, but they are plan-wide losses. The arbitration agreement excludes, it carves out, ERISA-related benefits claims, right? It does, Your Honor. Okay, and it doesn't say anything about fiduciary duty claims, right? There's no carve-out specifically for ERISA-related fiduciary duty. There is not a specific carve-out. What would be the reason for treating them differently? Can you think of any? Well, because the benefits claims are individual claims. But the fiduciary duty claim is ultimately going to be down to the benefit of Cooper, right? I mean, the damages he's seeking are ultimately going to make him whole on the deficiency in the benefits, right? Ostensibly, but really when you prosecute a claim as a plan claim, you are taking the position that you want the losses recovered to the plan. And so the way that that may work out once you get to judgment and distribution is maybe you get your losses back, but there's a very complicated analysis that gets done in terms of how the losses would be because you have to do this tracing and you have to sort of figure out where the losses come from. Back through the plan. Exactly, and so that's another reason why this is a very particular kind of claim. It's not, I lost this amount of money in my account, therefore I get this amount of money back. That's not what a 502A2 claim really contemplates in that direct. You're arguing the fact that an ERISA-related fiduciary duty claim is not listed as a carve-out supports a conclusion that it was outside of the scope. Outside of the scope. That's correct, Your Honor. Thank you very much. Thank you, Your Honors. We'll reserve the decision.